Good morning, Your Honors. My name is Elizabeth Krusek. I represent Damien Wathogoma. I will watch the clock and attempt to reserve approximately three minutes for a rebuttal. Thank you. The district court here committed multiple errors that both individually and combined require reversal of Mr. Wathogoma's conviction and remand for a new trial. Running through this case, the thread I think that holds everything together is Mr. Wathogoma's interrogation and purported confession that impacts all the issues that I've raised with the exception of the supervised release one. And so with that in mind, my plan is to talk first about the voluntariness issue and then the judge's response to the jury's question, because those both implicate the purported confession directly, and then move on to other issues, although I am happy to revise my plan at any time if your questions indicate that I should. So I'll start with the voluntariness. This is a case where there are multiple coercive techniques that were used to overbear Mr. Wathogoma's will. And I would point you to there is a brief section of his interrogation where you can see all of these techniques coming together from ER 492 to ER 501, where there are misrepresentations about the strength of the evidence. Counsel, aren't police officers allowed to misrepresent evidence when they're questioning? So the case law is that misrepresentations do not necessarily equal coercion, and I'm not disputing that. But if you look at a case like Crawford, it talks about misrepresentations. There's a fine line between a misrepresentation and coercion. You can lie, but you can't coerce. And so the question is kind of how much daylight is between that. And so — In your view, how many misrepresentations were there that were made by the police? There were two significant ones, and I can identify exactly what they were for you.  First was that Detective Ghanis said that Mr. Wathogoma's grandmother saw him with his pants down. And he admitted that he was mistaken on that, but someone else had said that. So is it a misrepresentation if it's not intentionally done? Yes, I think it is, because for — and let me talk about why, because the question is the impact on Mr. Wathogoma, okay? So what happened is Detective Ghanis starts out and he says, Becky, your grandmother saw you with your pants down, which we all know was not accurate. And then he says, A.C. also says your pants were down. So it's not just a substitute. It's the two people who were awake and were seeing things at the time. So basically, Grandma Becky is not going to be a witness for you, even though that's not what she said. And A.C. is not going to be a witness for you. Did A.C. say his pants were down? She did. Okay, so that was not a misrepresentation. No, that's not a — the misrepresentation is that Grandma Becky said his pants were down, okay, when that's not what Grandma Becky said. So that means Grandma Becky is not going to help you. And then he makes a — You think Grandma Becky was going to help him? Otherwise, because hadn't he been told to leave the home, and so would he have been surprised that Grandma Becky wasn't going to help him after she was the one who initially accused him, correct? And told everyone else what he was doing. Well, I think there's a significant dispute about what he was doing. Well, but that's not the question. The question is his perception of what Grandma Becky would do in his defense. And she was the one who sounded the alarm, so to speak, in terms of what he was doing to A.C. So why would the fact that she said something have an effect on him, her not being in support of him, when she already wasn't in support of him? Well, she actually was in support of him because what she said to Detective Ganas during a body cam interview that I submitted was that he didn't touch her and he didn't have his pants down. So what she would have admitted to having seen when she walked into the living room was Anais with her pants down and Mike, or excuse me, the A.C. with her pants down and the Mr. Guatagoma behind her not touching her with his pants up. That's not a crime. That's not what she told the other members of the family, though. We don't know. She screamed out something. That's what she said she saw, but what she told the police wasn't. But let me move on to you. I'm just saying in terms of your attaching so much importance to the effect it would have on him about his grandma, the record is mixed on that. But let me move on because there's more than just the grandma. Then Detective Ganas says, I spoke with or I listened to the confrontation call with Serena and you said your pants were down, which wasn't true. So what has happened is he's now convinced Mr. Guatagoma that no one is going to say what Mr. Guatagoma has said and what his grandmother actually said to the police, which is he wasn't touching her and his pants were up. And so there's no out for him at this point. And then it is Detective Ganas who says, hey, I know it's hard to admit that your penis touched her butt, but it's not like you killed her. And that's really the first time that Mr. Guatagoma has heard that particular allegation. It's Detective Ganas that brings it up. And then Detective Ganas says, and you said to Serena that your penis was out. And then he says, you know, the thing that's really important here after Mr. Guatagoma then hears that there's no witness that is going to assist him in his defense. The most important thing here is to confess to get your family's forgiveness. And his family is very important to him. And he wants to come back. He had offered to actually take his life. How long did this interview go? It went for about 50 minutes. 50 minutes? Where did it take place? It took place at a school. Okay, so it's not like he was interrogated for hours in the middle of the night in the station house. No. This is at his place of employment? Which I would point out, Your Honor, is an elementary school. And that was another technique that was used. And he chose the room that it was where the interview took place, correct? I believe that he did lead them to an empty multipurpose room. So and then, you know, it's only a 50-minute conversation. Yes, they used some standard police techniques to overplay the evidence and to try and minimize the guilt, to try and open up the conscience. I don't see how under our case law that amounts to involuntariness. I would say that it does, Your Honor. I think the combination of the coercion and using the family and the nature of the misrepresentations. But if I may pivot and say that the jury also had questions about this confession, I think. Before I leave that, tell me the closest case you have in the Ninth Circuit that fits the circumstances of this case that would show involuntariness. And I acknowledge I don't have a four square on the facts case, Your Honor. I think the sort of Tingle McShane line of cases where you're using coercion, you're using sort of leverage of a loved one against a person, I understand that my facts are not like within, you know, spot on with that. But I think that idea and the problem with this case is that there's a combination of coercive techniques, in my view, that are at play. All right. But in any event, whether the judge erranted admitting the confession or not, the jury had questions about that confession and what they should do with that  Counsel, when you say the jury, do you mean a juror, or did I misread the record? Well, there was a jury question that was signed by juror number eight, and I suppose that's the record that we have. We know there was at least one juror who had those questions.  I just want to be clear. And I think because we don't know if that was a combined, if juror number eight was the foreperson who was submitting questions on behalf or not. Is juror number eight the foreperson? I don't know off the top of my head, Your Honor. Because a lot of times, if it's from the entire jury, it'll be the foreperson who sends the question. But in any event. But in any event, there were questions. And the response that the district court gave was misleading and effectively Ultimately, defense counsel agreed to the compromise instruction response. True? No, not true. There was a there was an extended discussion. And the defense counsel objected and said, when you bring issues of evidentiary, when you say evidentiary issues, that can be confusing. And I think he says you should just look, you should just say, look to the jury instructions and the evidence. And then there's an objection. I may have misread the record. I thought that each side had a submission and the district court basically cobbled them all together. And at that point, there was no objection from the defense counsel. No, no, because. I'll ask the government what their view is. Yeah, yeah. Defense counsel did preserve the objection. And I don't think the government disagrees with me on that. We may disagree about what we actually propose, but we don't disagree about that, I don't think. You disagree with the court's characterization of the questions as those seeking to resolve evidentiary issues? I do. And the reason for that is, first of all, I don't I'm not entirely I think that the district court was trying to say admissibility of evidence is the best that I can figure out. But I don't think that these questions in the context of the way that the case was litigated go towards evidentiary issues that are beyond the purview of the jury. They asked questions that went directly to the circumstances of Mr. Huatha Goma's interrogation. They did ask whether that interrogation is legal. In context, what that means is, should we be hearing that confession? Is there something wrong with that confession? And the jury instruction they get — The question is about why was he interviewed where he was interviewed and — Correct. That goes — that goes towards the circumstances of the confession, which are directly related to the jury instruction on voluntary — What should the court have said in response to a question as to why was he interviewed where he was interviewed? What should the court have said in response to that question? So I think — and as I said in my brief, I have not taken the position that the judge should have directly answered that question. I think for that particular question, he said you have to rely on your own memory for what the facts of the case are. It's your duty to determine what the facts of the case are. If there's a larger question of what could the court have said that would not have been misleading to all of these questions, I think the court could have said, you know, you must rely on your own memory for the facts, and you must look to the jury instructions. I think the real — Was it an error for the court to not say that? Yes, it was, because what the court also said is you are to rely — or you are not here to decide evidentiary issues. What was wrong with the court saying that? It's not the jury's function to decide evidentiary issues. Because it's very confusing. The jury is supposed to decide the weight of the evidence. The judge gets to decide the admissibility, but the jury decides the weight. And when the judge says you're not here to decide evidentiary issues, that strongly suggests that nothing that the jurors were interested in with relation to this confession was relevant, and that is not true. The juror's question was doing two things. One, it was asking for facts that were not in the trial record and asking for the answers to those facts. And then second, it was asking whether or not the actions were lawful, which goes to issues like whether it was involuntary and should have been admitted. And it's not the role of the jury to expand the factual record. It's not the role of the jury to decide the lawfulness of the evidence that's been presented to them. So I don't see why, you know, the answer that says stay in your lane, basically, is inappropriate. Because it directed the jury outside of its lane would be my response to that. Because the jury — it negates this instruction. There's a specific instruction, which defense counsel pointed out, about voluntariness, voluntariness may be a pretrial evidentiary issue, but there's also part for the jury to — Sotomayor, but that instruction doesn't say that the jury should be speculating about things that are not in the record. It should be looking at all the circumstances in the record and not thinking about other things they'd like to know that aren't there. Right. But in context, when you say you are not here to decide evidentiary issues, what that conveys is this is not a question that is within your purview. And the fact is there are certain aspects of that issue that are within the jury's purview. I see I am down to a low amount of time, so if I may, I'd like to reserve the remainder. Hear from the government. Good morning, Your Honors. May it please the Court, Amanda Tesaruk on behalf of the United States. The jury's verdict in this case should be affirmed because all of Appellant's arguments attacking the validity of that verdict are not errors, and they are certainly not reversible errors. I'd like to start with voluntariness unless the Court would like me to address other issues. I'm happy to do so, but on the issue of voluntariness, this was a voluntary confession. Mr. Wadigoma, the defendant, was approached at his place of work. As Your Honors have already noted, he wasn't in a police station. He wasn't restrained in any way. One of the very first things he was told was that he was not under arrest, and he was told multiple times during the interview that he would not be arrested that day. He had graduated from high school with honors. He had finished some college. And so, as again, Your Honors have also noted that this was an interview that was under an hour long. This was not an interview that overbore the defendant's will. Now, Appellant has argued that it did because there were misrepresentations made by law enforcement. Your Honors have already recognized that in this circuit, it is recognized that misrepresentations by law enforcement do not negate the voluntariness of a confession. Officers are allowed to overstate evidence they have. They're allowed to engage in trickery, deceit, misrepresentations. And in this case, the misrepresentations, as the officer testified at trial, was largely inadvertent. He mistakenly attributed a statement made by one witness to a different witness. And as Your Honor has recognized, Grandma Becky was not going to testify on behalf of Mr. Wadigoma, on behalf of the defendant, during this case. She was the one who saw this happening. She was the one who stopped this. She was the one who yelled to the living room that the defendant is humping AC, that he's trying to have sex with her granddaughter. She was the one who stopped this entire thing from happening. So the argument that somehow, knowing that Grandma Becky wasn't going to be in his corner, she wasn't going to be in his corner to begin with. Furthermore, there's this argument about using family as some sort of a excuse for someone to confess. And the appellant has cited to Tingle for that proposition. But the facts of Tingle are completely different from the facts in this case. In Tingle, you had a mother and her two-year-old child, and law enforcement officers told her, you're not going to see your child for a long time unless you start coming clean. And what the Court recognized in that case is that the relationship between a parent and certainly a minor child, or maybe even just a child in general, embodies a primordial and fundamental value in society. And the Court recognized a similar sort of situation in McShane, although in McShane they held that the confession was still voluntary, but the idea of significant others, boyfriend, girlfriend, maybe spouses, I'm sure we can think of relationships that are so close where you're providing for someone, you're trying to protect someone, that it could overbear your will and you might confess to something that you actually didn't do. In this case, the defendant stopped by this family's house at most, of his own admission, at most twice a month. They certainly knew him. They were familiar with him. They were even friendly with him. But this isn't someone who provided for them in any way. It's not someone who took care of them in any way. They didn't depend on him for anything, and he didn't depend on them. And so the idea that this relationship could be used to overbear his will is just one that strains Tingle and sort of strains credulity. Furthermore, the difference between Tingle and McShane, in McShane, the court recognized that one of the reasons why that confession was held to be voluntary is because the girlfriend who was brought to the police precinct where the boyfriend was being questioned, there was a legitimate purpose in doing so. The girlfriend was a material witness in the case. The police needed to speak with her. They didn't bring her in just for the purposes of coercing a confession out of the defendant. In Tingle, they recognized that there was really no reason to bring up the two-year-old child of the defendant, except for to coerce the confession for a bank robbery. In this case, the victim in the case is one of defendant's family members. It's his niece. These family members were also witnesses. So in talking about the investigation and talking and interviewing the defendant, family members are necessarily going to come up to the defendant and say, what did you do during that conversation? For those reasons, this confession was voluntary. And unless the court has any additional questions on the issue of voluntariness, I'd also like to turn to the other issue that was raised by appellants during their oral argument of the jury instruction. The appellant, I think, essentially is getting at sort of what is around the questions that are asked, that they implicate the confession. But the problem is, we have to look at the questions that were actually asked. They didn't ask about, can we consider the circumstances of the investigation? The questions that specifically were asked were, was the confession legal? Was the defendant told what to expect? That's a factual question. Why did they interview him at his work? Another factual question. Should he have been given his Miranda rights? A legal question. Could this be grounds for appeal? Clearly, it was grounds for appeal, as we now know, but it was not a question within the jury's purview. It was something outside of what they were there to decide, which was guilt or innocence of the defendant. And so in fashioning a response to those questions, the judge had a responsibility to tell them, you're going down the wrong path. You're going down some rabbit holes and steer them back on track. And that's exactly what the judge did. He told them, you're not to consider evidentiary issues. Now, to the extent that that was in any way unclear, and I'm not conceding that it was, but if it was, he then immediately followed it up with, you are to consider the evidence presented and the jury instructions. And the jury instructions explain what the jury can consider, what is proper for them to consider, the circumstances of the statements made by the defendant. Additionally, there are jury instructions regarding, you must rely on your own memory. And so these factual questions, you have to rely on whatever you heard. So directing them back to the jury instructions as a whole should answer all of the questions that are in the questions that they submitted to the court. This court is to presume that the jury understands the answers, the judge's answers to its questions. And that's not Ninth Circuit case law. That's United States Supreme Court case law. The United States Supreme Court has said that we presume that a jury understands the answer that a judge gives to a jury's questions. And here there were no follow-up questions. The jury did deliberate for a period of time after they received the answers to their question and then ultimately returned with a verdict of not guilty. And so from that record, we are to presume that they understood the answer that they were given from the judge. I would like to address briefly the question regarding supervised release conditions. I think that, Your Honors, you can — you have a lot of discretion over what you do in remanding this case. Appellant and I both agree. I don't have a lot of discretion because our law says that the oral pronouncement controls. And so if there is a discrepancy between the oral pronouncement and the written judgment, what we have done traditionally has been to remand for the written judgment to conform to the oral pronouncement. Certainly, Your Honor. And you could do that in this case. The government's position isn't — Why would we do otherwise? So the reason to do otherwise is because this case — or the issue of Montoya, that case changed sort of the framework of the supervised release conditions. Because prior to Montoya, if conditions were included in the pre-sentence report, it was sort of assumed that the defendant was on notice. And then Montoya said, no, this is part of the sentence. It has to be pronounced orally in court. Right. Right. This case was sentenced, I believe, prior to Montoya. And so Montoya, because those conditions were not imposed, the court didn't remand for conforming the judgment and conviction to the oral pronouncement. It remanded for the reimposition of the conditions.  But the written judgment in this case included conditions that were given orally but expanded on them. And so that's a different situation. So why should we allow the district court to expand on conditions that's already been imposed? Wouldn't that be like a resentencing almost? Well, Your Honor, I think there are two answers that I would give to that. The first is that in Montoya, there were conditions that were not included. In this case, there are conditions that are included, but there are parts omitted. But I don't necessarily know that the court has to draw some sort of a line between how much of a condition has to be omitted. Is it the entire condition? Then can you remand? Is it an entire group of conditions? Then can you remand? Is it certain parts? Well, but the case we have here is that the conditions were pronounced orally. Yes, Your Honor. And then the written judgment expanded on them. And so isn't the defendant entitled to have the conditions that were orally pronounced and that he has to adhere to be the ones that are set forth? And because if it goes back, then the conditions are being expanded. Well, I think that the conditions, if you look at the parts that are omitted, I think there are some parts of the conditions that are omitted that actually clarify what the condition means and maybe are even protective to. I think part of the condition that was omitted was that he has to tell other people that the premises is subject to search. That's something that might protect other people. Where did that extra language come from? Does it come from like a standard form or anything? Was any of the stuff that was added in the written and not in the oral mandatory? It was not mandatory, Your Honor. None of it was mandatory. None of it was mandatory. They are special conditions, and they're included in the pre-sentencing report, typically, and then the judge goes through and imposes. Does the pre-sentence report have as a recommended condition the full language that was put into the written judgment? Yes, Your Honor. And prior to Montoya, that. That kind of shorthand. That likely would have been enough. And then Montoya was decided and said that's not enough. I think that Your Honors have the power to send it back to allow the district court to reimpose these conditions as they were set out in the pre-sentence report. And I think it might be prudent to do so here because of that issue that Montoya, which sort of changed the framework of how judges impose these conditions, was decided after the case was sentenced. We'll hear from the defendant on that point. Yes, Your Honor. With that, unless the court has any further questions, we would ask that this court affirm the jury's verdict and remand for reimposition of two of the special conditions. Thank you, Your Honors. Counsel, could you start with your position on the remand of the supervised release conditions? Yes, ma'am. My position is that this court has very clear case law regarding the relief for the claim that I made. Montoya is a different situation because those are the set of standard conditions that show up in the PSR and that were not read orally. These conditions, and there's two conditions, and there's portions of the conditions that the judge did not read into the record. These conditions are special conditions that had to be read orally. They were read orally. And the judge omitted certain parts of them. And so our position is simply that Montoya is not applicable here. Well, but Montoya, over my dissent, held that you can't use shorthands. And it was a very common practice pre-Montoya for district judges not to sit there and read all the verbiage that's in the list of conditions that are in the pre-sentence report, but to tick through the list more generally. And so why? And the judge here did. Given that this was pre-Montoya and the judge may have been doing a shorthand to what's in the pre-sentence report, why shouldn't we send it back to say, well, what did you really mean now that you can't use any shorthands? You've got to say it word by word. Your Honor, so because these are special conditions, shorthand wasn't allowed pre-Montoya either. These are special conditions of supervision that had to be imposed on the record. And so the judge's decision to read them in whatever manner he chose, that is what the sentence is. So my position is Montoya is not really in play here because it's a different circumstance. The judge always would have had to read these conditions. And he did. He did read most of them. He left out certain parts. And so our position is simply that the parts that he did not orally pronounce are not part of the judgment.  Counsel, your position is Montoya is limited to standard conditions and not special conditions. Correct. Because the law didn't change as to special conditions. Montoya doesn't change that law. All right. Thank you, Counsel. I would just — I know I'm almost out of time, but I do want — Well, you're over time, but we — I asked you a question. So just — I'll complete your thought. I wanted to address one issue about the response to the jury's questions, which, as you look at the questions, is actually asked. I don't dispute that, but you have to look at the questions in context. The judge — and the case law on this is clear. This is not the kind of general jury instructions are fine. There are specific case law that addresses what happens when the jury asks a question at the end of a case like this. And what the judge says is extremely important because it's the last word that comes out of the judge's mouth. And that case law makes very clear that the judge has a very specific obligation to try to understand what it is the jury is asking and answer it in a way that allows — You know, the judge did that in this case, tried to understand what the jury was asking. I think he misunderstood. Most trial judges are very assiduous about that, and they try to understand what the jury is asking. Well, the judge here immediately said the jury is — these are not questions that are appropriate for the jury. And my position is that at least some of those questions were in the implicated circumstances and when viewed in the context. You disagree with the way the judge saw the case. I think that he too narrowly interpreted the question, Your Honor. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the Court. We will be in recess until 1115.
judges: RAWLINSON, COLLINS, Fitzwater